IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 29, 2011 Session

## JAMES DANIELS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Cocke County**
**No. 1063     Rex H. Ogle, Judge**

_____

**No.  E2010-01443-CCA-R3-PC-FILED-JUNE 2, 2011**

_____

Petitioner, James Daniels, was convicted by a Cocke County jury of first degree murder and attempted second degree murder. He was sentenced to concurrent sentences of life in prison and twelve years, respectively. Petitioner's convictions were affirmed on direct appeal and the supreme court denied permission to appeal. *State v. James Wesley Daniels*, No. E2006-01119-CCA-R3-CS, 2007 WL 2757636 (Tenn. Crim. App., at Knoxville, Sept. 24, 2007), *perm. app. denied*, (Tenn. Feb. 4, 2008). Subsequently, Petitioner sought post-conviction relief on the basis of ineffective assistance of counsel. After a hearing on the petition, the post-conviction court dismissed the petition for relief. Petitioner appeals. After a review, we determine that Petitioner has failed to present clear and convincing evidence that he received ineffective assistance of counsel. Accordingly, the judgment of the post-conviction court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and J.C. MCLIN, JJ., joined.

Heather N. McCoy, Sevierville, Tennessee, for the appellant, James Daniels.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; Al Schmutzer, Jr., District Attorney General, and James B. Dunn, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Factual Background*

On direct appeal, this Court summarized the facts at trial as follows:

Lisa Mathis testified that on May 31, 2004, she lived in a mobile home at 115 Horn Way in Newport. Charles Adams and Jamie Cox were visiting with Ms. Mathis when [Petitioner] first came to the residence on May 31. Ms. Mathis did not know [Petitioner]. When [Petitioner] saw Cox, [Petitioner] stated, "[W]e have a problem." Ms. Mathis asked [Petitioner] to leave as she held a baseball bat. [Petitioner] replied that he would be back with something more than a stick. According to Ms. Mathis, [Petitioner] and Charles McGaha, the co-defendant, returned that evening at approximately 10:15 p.m. [Petitioner] had a handgun, and McGaha had a rifle. Mathis and Adams were in the living room when [Petitioner] entered the home. Cox, Mike Benson, and David Shults were in a bedroom in the rear of the mobile home. [Petitioner] ignored Mathis' request that he leave and proceeded toward the rear bedroom. Mathis had called 9-1-1 when McGaha entered. McGaha pointed the rifle at Mathis' head and told her to drop the phone; he then asked her "where the s.o.b. was." Mathis stated that she heard a gunshot; McGaha then went toward the rear bedroom. As Mathis ran to her neighbor's house, she heard another gunshot.

Michael Benson testified that he had gone to Mathis' home with David Shults on the day of the shooting. Benson, Shults, and Cox were in a rear bedroom preparing to smoke cocaine when [Petitioner] came in with a handgun, yelling at Cox. Benson ran outside and hid behind a tree. On his way out, he saw McGaha with a rifle. From his hiding place, Benson heard two gunshots. He saw two cars leave; Benson identified the driver of one car as Shults but could not identify the occupants of the other car. Benson had never seen [Petitioner] or McGaha previously.

Eryn Wilds worked at the Eastport BP in Newport. She testified that she knew [Petitioner] and had seen him twice on May 31. He was at the store the first time at approximately 3:00-3:30 p.m. and was there a second time at approximately 10:15 p.m. Ms. Wilds said that [Petitioner] was driving a Subaru and that he was accompanied by another man. [Petitioner] first asked to get gas, but the station was closed. [Petitioner] next asked to borrow five dollars, and she refused. Ms. Wilds stated that [Petitioner] was acting "sort of hyper."

Derrick Woods, a detective for the Cocke County Sheriff's Department, arrived at the scene at approximately 11:00 p.m. Other officers directed him to the bedroom where the deceased Jamie Cox was lying on the floor. A rifle

cartridge, 7.62 caliber, was found beside a night stand on the floor. A .40 caliber handgun cartridge was found in the bedding. Detective Woods described observing a bullet hole which went through a pillow, a mattress, and through a wall in the mobile home. Another bullet hole, exiting the trailer, was observed on the left wall. No weapons were recovered. The detective drove three possible routes between the Eastport BP and the Mathis home. In distance and time elapsed, they were measured as follows: route one: 3.27 miles and six minutes, thirteen seconds; route two: 3.76 miles and ten minutes, forty-four seconds; route three: 3.48 miles and eight minutes, forty-two seconds.

Certain stipulations were introduced into the record. The TBI found no evidence of blood in [Petitioner's] Subaru automobile. The deceased was analyzed for alcohol content, and the test results were: blood-.19; urine-.25; vitreous-.21. The toxicology tests reflected that the deceased's blood had marijuana metabolites of 23.3 ng/ml. The urine sample was negative for barbiturates, benzodiazepine, cocaine, and opiates. A white powder substance and plant material were submitted for testing by the TBI. The white powder was negative for controlled substances, and the plant material was identified as marijuana residue.

Kim Fine was the victim's girlfriend at the time of his death. She had previously lived with [Petitioner]. She stated that [Petitioner] had a problem with the victim and had told her four years previously that, if [Petitioner] saw the victim, one of them would die.

Charles Adams stated that he was visiting with Ms. Mathis on May 31. Adams was present when [Petitioner] first came to the home. He heard [Petitioner] tell Mathis that he would return with something more than a bat. When [Petitioner] returned a second time, Adams and Mathis were in the living room. Adams saw [Petitioner] and McGaha arrive and went to the bedroom to warn the victim. [Petitioner] and McGaha came to the bedroom. [Petitioner] had a handgun, and McGaha held a rifle. [Petitioner] fired the handgun; [Petitioner] and the victim then began to wrestle for possession of the gun. [Petitioner] told McGaha to "shoot this s.o.b." McGaha shot the victim from a distance of three to five feet, and the victim fell to the floor. [Petitioner] pointed the pistol at Adams and "acted like" he pulled the trigger but the gun did not fire. [Petitioner] told McGaha to shoot Adams, but McGaha refused. As [Petitioner] was leaving the bedroom, he said, "[S]ay it

was self defense." Adams watched [Petitioner] and McGaha leave in a Subaru vehicle.

Dr. Darinka Mileusnic-Polehan, a forensic pathologist, testified concerning the findings of her autopsy of the victim. The cause of death was a single gunshot that entered the victim's back, perforated his left lung, tore his heart, and exited through his chest. The residue of the wound indicated that it was a contact wound or was fired from very close range.

[Petitioner] was indicted in a two-count indictment for premeditated first degree murder of James Quinton Cox and attempted premeditated first degree murder of Charles Adams.

*Id.* at *1-3. At the conclusion of the proof, Petitioner was convicted of first degree murder and attempted second degree murder. He was sentenced to life imprisonment for the premeditated first degree murder conviction and twelve years for the attempted second degree murder; the sentences were ordered to run concurrently. Petitioner appealed his convictions, raising the following issues on appeal: "1) the evidence was insufficient to support the convictions; 2) the trial judge erred in refusing to recuse himself after a challenge to his impartiality; and 3) error was committed by failure to take curative action or declare a mistrial after some jury members viewed [Petitioner] handcuffed and shackled." *Id.* at *3.

On appeal, this Court determined that "the evidence supports the convictions beyond a reasonable doubt; [Petitioner] waived the issue as to recusal by the trial judge; and [Petitioner] has not demonstrated undue prejudice due to jury members inadvertently observing [Petitioner] in restraints. *Id.* at *6. The supreme court denied permission to appeal.

Subsequently, Petitioner filed a timely pro se petition for post-conviction relief. In the petition, the following issues were raised: (1) Petitioner was prejudiced at trial by not being allowed to discuss the victim's violent history; (2) trial counsel was ineffective; and (3) prosecutorial misconduct impaired Petitioner's ability to defend himself. As to ineffective assistance of counsel, Petitioner specifically claimed that trial counsel failed to effectively cross-examine witnesses, failed to interview witnesses, and failed to file timely objections. Counsel was appointed, and an amended petition was filed. The amended petition added allegations of ineffective assistance of counsel, including that trial counsel failed to move to sever Petitioner's trial from his co-defendant, failed to obtain an independent expert, failed to object to photographs, and failed to present a defense. Petitioner also alleged that he received an excessive sentence. Prior to the post-conviction

-4-

hearing, Petitioner filed another amendment to the petition for post-conviction relief to include an allegation that Petitioner was not properly given credit for all time served prior to his conviction.

*Evidence at the Post-conviction Hearing*

At the post-conviction hearing, Petitioner testified that he had a history of conflict with the victim. According to Petitioner, he and the victim had been fighting since 1998 or 1999. Petitioner even testified that the victim robbed him at gunpoint when they met because Petitioner was planning on renting a trailer from the victim. Petitioner stated that he could recount "numerous amounts of stages" of conflict involving him and the victim where weapons were involved. Petitioner "took a warrant" out on the victim after the robbery. Petitioner recounted a separate incident that happened when Petitioner was helping to pick up garbage. During this incident, the victim stopped his vehicle, got out with a lug wrench, and spat at Petitioner.

Petitioner testified that trial counsel did not come to see him until four months prior to the trial. According to Petitioner, the two only met twice prior to the trial. Petitioner recalled that the first visit lasted about twenty minutes and the second visit lasted no longer than forty-five minutes. Petitioner claimed that he met with and saw his co-defendant's attorney more that his own.

Prior to trial, Petitioner reported trial counsel to the Board of Professional Responsibility and to the trial court. Petitioner alleged that trial counsel failed to meet with him to discuss the case.

Petitioner remembered telling trial counsel prior to trial that he was present at the crime scene on the night that the victim was killed. Petitioner told trial counsel that the victim came to his house and threatened him on the day that the murder took place. The victim stopped outside Petitioner's house and got guns out of the back of his car. He gave trial counsel a list of potential witnesses, including David Dollar, whom Petitioner thought was involved with Lisa Mathis. On the day of the crime, Petitioner took Mr. Dollar to Ms. Mathis's trailer, not knowing that the victim was there at the time. According to Petitioner, trial counsel gave the list back to Petitioner and told him that there was "another plan" for the defense. Petitioner again gave a list of witnesses to trial counsel on the eve of trial. Petitioner was disappointed that trial counsel did not contact any of these witnesses and did not present any evidence to corroborate Petitioner's version of the events.

Petitioner testified that trial counsel advised him not to testify because his testimony would conflict with the defense theory that Petitioner was not at the crime scene. Petitioner

recalled that there were four witnesses placing him at the crime scene. Trial counsel did not present any witnesses at trial.

Petitioner admitted at the hearing that he always carried a gun with him, in part because his arm was injured and he was afraid of the victim. Petitioner testified that he felt threatened on the night of the murder. Petitioner admitted that there were four people in the room when the victim was shot: Petitioner, the victim, Charles Adams, and Petitioner's uncle. Petitioner claimed that he told the victim to leave him alone and that he wanted the conflict to be over. At that time, the victim jumped up and grabbed Petitioner. Petitioner tried to get his gun out of his pants, and the gun fired. Petitioner claimed that the first shot went into the air and that he and the victim continued to wrestle. Petitioner stated that both men had their hands on the gun and he felt his life was threatened. Petitioner claimed that he did not shoot the victim and did not know who was responsible for shooting the victim. Petitioner also denied asking his uncle to shoot the victim. Petitioner also denied that he was run out of the house earlier by Ms. Mathis and told her that he would return with something larger than a stick.

Stephanie Phillips testified at the hearing that she and Petitioner were robbed at gunpoint by the victim several years prior to the murder. According to Ms. Phillips, during the robbery the victim demanded Petitioner's money and then fired a gun. Petitioner ended up giving the victim his money. Ms. Phillips recalled that she and Petitioner went to the police after being robbed but that the warrant was later dismissed. Ms. Phillips testified about several other occasions during which the victim drove past Petitioner's aunt's house and pointed a gun out the window at them. Ms. Phillips denied that she was a violent person but admitted that she pled guilty to second degree murder. Ms. Phillips insisted that trial counsel did not contact her prior to trial even though she was being housed in the Cocke County Jail awaiting her own trial at the time.

Benjamin Daniels, the brother of Petitioner, testified that the victim told him and Petitioner about six years prior to the incident to leave town or there would be trouble. Mr. Daniels remembered that about one year later the victim threatened to fight and hurt Petitioner. Mr. Daniels testified that he took Mr. Dollar to Ms. Mathis's house prior to the murder.

Petitioner's father also testified at the hearing. He claimed that he witnessed an incident during which the victim told Petitioner he was going to "cut his guts out." This took place about one month prior to the victim's death. Petitioner's father testified that he was not contacted by the defense team prior to the trial.

Anthony Baxter testified that he had witnessed several confrontations between Petitioner and the victim prior to the victim's death. Mr. Baxter stated that during one incident in particular, Mr. Baxter, Petitioner, and a third man got into a fight with the victim and some other men.

Petitioner's trial counsel testified that he was appointed in January of 2005 to represent Petitioner. Trial counsel was not Petitioner's first attorney. Trial counsel recalled that Petitioner reported him to the Board of Professional Responsibility and testified that he met with Petitioner prior to trial but that he could not recall how many times. Trial could not recall whether the meetings took place before or after the complaint was made to the Board of Professional Responsibility. Trial counsel responded to Petitioner's complaint by compiling a detailed listing of his activity on the case. Trial counsel specifically recalled two visits "that were more than four or five hours in length." Trial counsel estimated that he met with Petitioner for "better" than ten hours prior to trial.

During their meetings prior to trial, Petitioner and trial counsel discussed trial strategy. Petitioner explained to trial counsel that there was a history of bad blood between him and the victim including prior gun fire. Petitioner even told trial counsel that one of them was "going to end up dead sooner or later." Trial counsel was told by Petitioner that it was "self-defense." Trial counsel explained to Petitioner that the circumstances did not justify self-defense. Trial counsel was told by Petitioner that there was an initial encounter between Petitioner and the victim on the day of the murder. Then Petitioner left for a period of time before returning with a gun and an armed friend. Trial counsel did not feel after hearing Petitioner's version of the events that they could "close the loop and meet the legal burden of self-defense." Trial counsel was satisfied that he had explained to Petitioner that they could not meet the legal burden to satisfy self-defense. Trial counsel explained that his strategy was to "fight the State at every step of this, to question each one of their witnesses at length, to question their conclusions, to question the timeline, to question what little physical evidence there was" but that there was not "an affirmative legal defense" that they could rely upon at trial. Trial counsel thought that Petitioner understood that they would not pursue self-defense as a theory at trial.

Trial counsel worked with co-defendant's attorney prior to trial. Trial counsel explained that there was "no reason" to sever the cases. The attorneys divided up the cross-examination of the State's witnesses and prepared for trial together. Prior to trial, trial counsel recalled reviewing the State's witness list and meeting with Petitioner's father. Trial counsel testified that he attempted to contact the potential witnesses that Petitioner suggested but that a lot of the witnesses would have helped to "attempt to establish a self-defense defense" and that was not the direction that would be taken at trial. Further, a lot of the telephone numbers provided by Petitioner were incorrect.

Trial counsel testified that he spoke and discussed with Petitioner the circumstances surrounding his decision to testify and recalled that Petitioner decided not to testify after being questioned by the trial court.

Trial counsel denied that he claimed Petitioner was not at the scene of the crime during the trial. Counsel "did not put on [this] affirmative proof . . . because we didn't have any proof like that." In fact, trial counsel recalled that the State's proof was very similar to Petitioner's version of the events.

Trial counsel thought that the jury could have seen Petitioner in handcuffs if they were looking out of the window when Petitioner was brought to the courtroom. However, Petitioner was not in handcuffs in the courtroom. Finally, trial counsel agreed that the issue was raised in court and admitted that he did not seek a curative instruction because he did not want to draw attention to the issue.

At the conclusion of the hearing, the post-conviction court determined that there was "no evidence" of ineffective assistance of counsel, no proof that would have supported the severance of the cases, and no proof that a self-defense instruction was warranted. As a result, the post-conviction court denied the petition for post-conviction relief.

Petitioner filed a timely notice of appeal.

*Analysis*
*Post-Conviction Standard of Review*

The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. *See State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). During our review of the issues raised, we will afford those findings of fact the weight of a jury verdict, and this Court is bound by the post-conviction court's findings unless the evidence in the record preponderates against those findings. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *Alley v. State*, 958 S.W.2d 138, 147 (Tenn. Crim. App. 1997). This Court may not re-weigh or re-evaluate the evidence, nor substitute its inferences for those drawn by the post-conviction court. *See State v. Honeycutt*, 54 S.W.3d 762, 766 (Tenn. 2001). However, the post-conviction court's conclusions of law are reviewed under a purely de novo standard with no presumption of correctness. *See Shields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

*Ineffective Assistance of Counsel*

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, the petitioner bears the burden of showing that (a) the services rendered by trial counsel were deficient and (b) that the deficient performance was prejudicial. *See Powers v. State*, 942 S.W.2d 551, 558 (Tenn. Crim. App. 1996). In order to demonstrate deficient performance, the petitioner must show that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). In order to demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). "Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997).

As noted above, this Court will afford the post-conviction court's factual findings a presumption of correctness, rendering them conclusive on appeal unless the record preponderates against the court's findings. *See id.* at 578. However, our supreme court has "determined that issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact . . . ; thus, [appellate] review of [these issues] is de novo" with no presumption of correctness. *Burns*, 6 S.W.3d at 461.

Furthermore, on claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight. *See Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. 1994). This Court may not second-guess a reasonably-based trial strategy, and we cannot grant relief based on a sound, but unsuccessful, tactical decision made during the course of the proceedings. *See id.* However, such deference to the tactical decisions of counsel applies only if counsel makes those decisions after adequate preparation for the case. *See Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

On appeal, Petitioner complains that the post-conviction court improperly denied his petition for post-conviction relief. Specifically, Petitioner argues that he received ineffective assistance of counsel because counsel: (1) failed to investigate pertinent facts and interview witnesses; (2) failed to file a motion to sever; (3) failed to move for a mistrial or seek a curative instruction when the jury saw him in handcuffs; and (4) failed to assert a self-defense claim at trial. Petitioner also insists that the ineffective assistance of counsel he received at trial led to an excessive sentence and a failure to receive proper sentence credits for his pretrial jail time.

The record supports the post-conviction court's findings. With regard to trial preparation and interviewing witnesses, the record shows that trial counsel met with Petitioner several times at length prior to trial. Trial counsel felt that he was prepared for the case in advance of trial. Further, trial counsel testified at length regarding the theory of the defense, which was formulated only after discussions with Petitioner. Trial counsel did not feel that the proof that could be offered at trial could support a self-defense theory and explained this to Petitioner. Trial counsel thought that Petitioner understood this explanation. Additionally, trial counsel testified that he discussed potential witnesses with Petitioner, received a list of those witnesses, and attempted to contact some of them prior to trial. Petitioner has not shown any prejudice in this regard. Petitioner did not present witnesses at the hearing that would have established a clear case of self-defense or that offered any evidence that was unknown to trial counsel prior to trial. Petitioner must present witnesses at the post-conviction hearing to prevail on a claim of deficient representation for failing to call a witness at trial. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). A post-conviction court may not speculate, "on the question of . . . what a witness's testimony might have been if introduced at trial." *Id.*

Petitioner also alleges that trial counsel was ineffective for failing to sever his case from his co-defendant's case. He notes that there was no response to the State's motion for joinder but fails to mention that the motion was filed several months prior to trial counsel's appointment. The only testimony at the hearing regarding joinder came from trial counsel who explained that there was "no reason" to sever the cases. Petitioner complains that his case should have been severed because co-defendant's theory of the defense was "mutually antagonistic" but offered no evidence at the post-conviction hearing to support his argument. The post-conviction court noted that there was "no reason that these cases should not have been tried together." Petitioner has presented no evidence to show that he was prejudiced by trial counsel's actions.

Petitioner also complains that there not a motion for mistrial or curative instruction after the jury potentially saw Petitioner in handcuffs. This issue was raised on direct appeal, and this Court found that there was no prejudice because Petitioner was seen outside the courtroom. *James Wesley Daniels*, 2007 WL 2757636, at *6. In other words, this issue has been previously determined. Further, trial counsel testified that he purposefully did not seek a curative instruction in order to avoid drawing attention to the matter. As stated above, we may not second-guess a reasonably-based trial strategy. *Adkins*, 911 S.W.2d at 347.

Petitioner also argues on appeal that trial counsel was ineffective for failing to present a self-defense theory at trial. Trial counsel testified that Petitioner did not present any evidence to him prior to trial that would have supported a self-defense theory. Further, Petitioner did not present witnesses at the post-conviction hearing that would have

-10-

established that his version of the events was that different from the State's version of the events. As stated above, trial counsel testified that he and Petitioner discussed the fact that the theory of self-defense was not viable at trial. Petitioner has shown no prejudice resulted from trial counsel's decision to exclude self-defense as a theory.

Petitioner complains that trial counsel was ineffective for failing to object when the trial court sentenced Petitioner to the maximum sentence in the range. Petitioner has not cited authority for this argument and has failed to cite to the record. This issue is waived. *See* Tenn. Ct. Crim. App. Rule 10(b); *State v. Sanders*, 842 S.W.2d 257 (Tenn. Crim. App. 1992).

Finally, Petitioner argues that his pre-trial jail credit was improperly calculated. This is not an appropriate ground for post-conviction relief. This issue is without merit.

*Conclusion*

For the foregoing reasons, the judgment of the post-conviction court is affirmed.


_____
JERRY L. SMITH, JUDGE

-11-